JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Reginald Evans appeals his convictions entered upon a jury trial in the Cuyahoga County Court of Common Pleas for one count of murder with a firearm specification, a violation of R.C. 2903.02. For the following reasons, we affirm.
{¶ 2} At trial, the following facts were established: On the morning of December 29, 2000, Wayne Carnegie was fatally shot once in the chest and twice in the back by the defendant.
{¶ 3} Prior to the shooting, defendant was spending the night with his girlfriend, Cheryl Carnegie. They were staying at the home of Yolanda Dean, a friend of Cheryl's. Yolanda lived in the upstairs unit of a duplex located at 3152 East 102nd Street in Cleveland, Ohio.
{¶ 4} At approximately 12:30 a.m., Wayne pulled his car into the driveway of Yolanda's house and began honking his horn. Cheryl and Wayne had been married for eleven years and had divorced in 1998. They had two children together. Cheryl had moved back in with Wayne for a few weeks in December of 2000, but had moved out on December 28, 2000. After the neighbors came outside to complain about his honking, Wayne left.
{¶ 5} At approximately 9:00 a.m., Wayne returned to the house and began honking his horn again. Defendant went downstairs and got into an argument with Wayne. Defendant then shot Wayne three times. Defendant left the house and left the State.
{¶ 6} Patrolman Michael Bazilius of the Cleveland Police Department received a call at 10:21 a.m. that a man had been shot at 3152 East 102nd Street. Upon arriving at the scene, he did not find a suspect or a murder weapon, but did find shell casings and a spent bullet in the back hallway.
{¶ 7} Detective Timothy Brown of the Cleveland Police Department Crime Scene Unit arrived at the scene as well. He collected the two .45 caliber shell casings and spent bullet. He also took photographs of the crime scene.
{¶ 8} On January 6, 2001, defendant was arrested in Detroit after a friend turned him in to the police. He was extradited from Michigan.
{¶ 9} On January 9, 2001, defendant was indicted by the Cuyahoga County Grand Jury for one count of aggravated murder, in violation of R.C. 2903.01(A), with a three-year firearm specification, for the death of Wayne Carnegie. Defendant entered a plea of not guilty at his arraignment and his case proceeded to a jury trial.
{¶ 10} At trial, the State alleged that defendant purposely caused the death of Wayne because he was tired of him bothering him and Cheryl. Defendant asserted self-defense. The State first presented the testimony of Dr. Frank Miller, a forensic pathologist in the Cuyahoga County Coroner's Office, who testified that Wayne died of three gunshot wounds to the left upper back, left side of chest and middle of back. The State next presented the testimony of Curtis Jones, a forensic scientist with the Cuyahoga County Coroner's Office Trace Evidence Department, who testified that Wayne's hands did not reveal the presence of gunshot residue.
{¶ 11} The State then called Yolanda Dean. She testified that she lived in the upstairs unit of the home where the shooting occurred and that she let Cheryl stay at her place for a few days prior to the shooting because Cheryl was having problems. Yolanda says that she did not know that defendant was staying at the house the night before the shooting. Yolanda testified that she left the house on the morning of the shooting at 5:00 a.m. to go to work. She received a phone call at work telling her about the homicide.
{¶ 12} Lori Elmore, Yolanda's sister, lived in the downstairs unit of 3152 East 102nd Street with her husband and children. On December 29, 2000, Lori was home with her ten-year-old son, Ricky. She heard Wayne honking the car horn at 12:30 a.m. Lori was awakened in the morning by the sound of Ricky playing a video game. As she walked from her bedroom, she heard four gunshots. She telephoned her mother, who lived next door, and within minutes her brother, Lafayette, came to the home and discovered Wayne's body in the back yard. Lori testified that she called 911. After the police arrived, Lori saw Cheryl come out of the house.
{¶ 13} Lafayette Campbell lived next door to his sisters, Yolanda and Lori. He testified that in the early morning hours of December 29, 2000, he heard a car horn honking but that it pulled away when he stepped outside. Lafayette testified that he heard three or four gunshots the following morning and found Wayne's body when he went outside to investigate. Lafayette then went into the house and told Cheryl what he had found.
{¶ 14} Cheryl testified that she worked as a corrections officer and was the ex-wife of Wayne. On the evening of December 28, 2000, she went roller-skating with Yolanda and the defendant. While she was skating, defendant held her pager. When they were done skating, defendant told her that Wayne had paged her several times. After skating, Cheryl and the defendant went back to the house. At around 12:20 a.m., she heard Wayne honking his horn outside the house. He honked his horn for approximately five minutes. She testified that defendant had a gun with him that evening.
{¶ 15} At around 9:00 a.m., Cheryl and defendant woke up and were watching television when she heard Wayne honking his horn outside the house again. She testified that defendant said, You know, I'm getting tired of this. Cheryl told the defendant that she was not going outside and that Wayne could not get in. The car horn stopped and approximately twenty minutes later defendant got up and left the room. Cheryl heard what sounded like firecrackers. Defendant came back into the room said, Cheryl, I'm gone and left again. Cheryl then went downstairs and saw Wayne's body in the back yard. On cross-examination, Cheryl stated that Wayne was very jealous about her relationship with the defendant. She stated that he followed her and that she filed a domestic violence charge against him in May of 2000. She also stated that Wayne had tried to run the defendant over and had threatened to kill him on numerous occasions.
{¶ 16} Ricky Elmore, age ten, testified that he lived with his parents at 3152 East 102nd Street. On the morning of December 29, 2000, he was playing a video game in his bedroom. He heard knocking at the back door, but since he did not recognize the man at the back door, he did not let him in and returned to his room. Ricky testified that he heard someone coming down the stairs and heard the back door open. He heard someone say go get Cheryl and then heard a voice using cuss words. The two voices were not the same voice. Ricky then heard three or four gunshots.
{¶ 17} Patrolman Anthony Harper, a DARE officer with the Cleveland Police Department, was a friend of Cheryl and the defendant. Harper testified that on the morning of December 29, 2000, defendant telephoned him and told him that he shot Wayne after a verbal altercation. Harper testified that he told defendant to turn himself in and tried to find out where he was.
{¶ 18} Antwan Blackshear, Cheryl's son and Wayne's step-son, testified that a week after the shooting, he answered a page that had been placed to Cheryl's pager and spoke to the defendant. Antwan testified that defendant told him he was sick of Wayne bothering Cheryl and that he went downstairs to tell Wayne to leave. Antwan testified that defendant told him that he and Wayne got into an argument, began shoving each other, and then defendant shot him. Antwan further testified that defendant told him that as he fired the gun, Wayne tried to run away and jumped over the porch into the back yard.
{¶ 19} For the defense, defendant testified on his own behalf. Defendant testified that shortly after he started dating Cheryl, Wayne started to make harassing telephone calls and stand outside his home. Defendant testified that Wayne smashed the window of Cheryl's car and scratched his car. Defendant testified that Wayne threatened to kill him. Defendant further testified that Cheryl had told him many times that Wayne had made threats against him. Defendant stated that he filed a menacing charge against Wayne in May 2000 and had to get a phone tap due to Wayne's constant harassing calls. Defendant also stated that Wayne had tried to run him over while he was standing outside his house with Cheryl in July 2000. Defendant testified that Cheryl told him that her gun was missing and that she suspected that Wayne had taken it. Defendant stated that he was in constant fear that Wayne would try and kill him. He testified that he started carrying a gun because of his fear of Wayne.
{¶ 20} Defendant testified that on the evening of December 28, 2000, he went skating with Cheryl and Yolanda. He testified that when they arrived home, in the early morning hours of December 29, 2000, he heard Wayne honking his horn outside the house and Cheryl's pager started going off. He also testified that he saw Wayne sitting in the driveway outside the house at 3:00 a.m. Defendant testified that at around 9:00 a.m. he heard honking outside the house and Cheryl's pager started going off again. He told Cheryl that he was tired of this. He heard banging on the door and went to get his phone to make a telephone call. When he realized that his phone was dead, he decided to go outside to get his extra battery. He testified that he took his gun and went downstairs. He states that he listened at the back door but did not hear anything. He stated that he opened the back door without looking and stepped outside and found Wayne standing there. Defendant testified that he got into a verbal fight with Wayne and then pushed him. He testified that as Wayne started to come forward at him, he discharged his gun because he could not see Wayne's right hand and he was afraid that Wayne was reaching for a gun. He testified that the gun went off very fast and that he was not aware of how many shots he fired.
{¶ 21} On cross-examination, defendant testified that he had gotten into a fight with Wayne in April 2000, where he stabbed Wayne in the left lung. He testified that he was protecting Cheryl and that he thought Wayne was reaching for something at that time as well. Defendant was not charged with any crime in connection with this incident.
{¶ 22} On May 29, 2001, the jury returned a verdict of guilty to the lesser included offense of murder, in violation of R.C. 2903.02, with a three-year firearm specification. Defendant appeals the verdict asserting five assignments of error for our review.
 I. {¶ 23} REGINALD EVANS WAS DENIED HIS CONSTITUTIONAL RIGHT TO DEFEND HIMSELF WHEN THE TRIAL COURT IMPROPERLY LIMITED HIS CROSS-EXAMINATION OF KEY STATE'S WITNESSES.
{¶ 24} In his first assignment of error, defendant argues that the trial court erred when it failed to allow two witnesses to present evidence pertaining to the victim's violent character. Specifically, defendant argues that Cheryl Carnegie and Anthony Harper should have been permitted to testify about specific instances of Wayne's violent behavior and that Cheryl suspected that Wayne had stolen her gun.[1] We disagree.
{¶ 25} The admission or exclusion of relevant evidence lies within the discretion of the trial court and will not be reversed on appeal unless the trial court has abused its discretion. State v. Combs (1991),62 Ohio St.3d 278, 284. An abuse of discretion is defined as a decision that is unreasonable, arbitrary or unconscionable, rather than a mere error in judgment. Blakemore v. Blakemore (1983), 5 Ohio St.2d 217.
{¶ 26} Generally, evidence about a person's character is inadmissible for the purpose of proving he acted in conformity therewith on a particular occasion. Evid.R. 404(A). However, a defendant arguing self-defense may testify about specific instances of the victim's prior violent conduct in order to establish his state of mind at the time of the incident. State v. Baker (1993), 88 Ohio App.3d 204. He may not introduce specific instances of the victim's conduct to prove that the victim was the initial aggressor. State v. Barnes (2002), 94 Ohio St.3d 21,24.
{¶ 27} Here, the trial court allowed the defendant to testify on a variety of the victim's prior acts. Defendant testified to harassing telephone calls, police reports, and to almost being run over by the victim. Defendant testified that Cheryl told him that she suspected that Wayne had stolen her gun and was armed with it. Defendant wished to present additional evidence of Wayne's violent behavior through the testimony of Cheryl and Anthony. This is not permissible. Corroborating evidence concerning specific instances of the victim's violent character should be excluded by a trial court. State v. Spinks (1992),79 Ohio App.3d 720; State v. Rogers (Aug. 17, 2000), Cuyahoga App. No. 76601, unreported; State v. Banks (June 15, 2000), Cuyahoga App. No. 76271, unreported. Accordingly, the trial court did not abuse its discretion by refusing to admit evidence of specific instances of violent incidents by Wayne from witnesses other than the defendant.
{¶ 28} Defendant's first assignment of error is overruled.
 II. {¶ 29} REGINALD EVANS WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY THE MISCONDUCT OF THE PROSECUTOR IN ITS CLOSING ARGUMENTS.
{¶ 30} In his second assignment of error, defendant argues that he was unfairly prejudiced when the State made improper statements during closing arguments. Since defendant's attorney failed to object during the State's closing statement, we will review under a plain error standard. State v. Long (1978), 53 Ohio St.2d 91. Plain error exists when but for the error the outcome of the trial would have been different. State v. Moreland (1990), 50 Ohio St.3d 58, 62.
{¶ 31} Defendant contends that in his closing statement the prosecutor made comments that were improper, unfairly prejudicial and constituted prosecutorial misconduct. We disagree.
{¶ 32} Here, the prosecutor in his closing statement made the following statements:
 {¶ 33} Prosecutor: One last thing I want to talk to you a little bit about and in jury selection, I asked you about half truths. I was trying to be a little bit [humorous] and I started talking about poor Bill Clinton and I smoked, but I didn't inhale, I didn't have sex with that woman.
 {¶ 34} But really the art of a half truth is to take a known negative that you can't deny and to add some lies on top of it to put a positive spin on it.
 {¶ 35} And the half truth really describes what you heard coming from the defendant's mouth and from his, some of his statements to Anthony Harper and Antwan Blackshear.
 {¶ 36} You are going to have to decide for yourselves which ones to believe, because his testimony on the stand was clearly different from what he told those two, Anthony Harper and Antwan Blackshear when he called him.
 {¶ 37} Let's talk about his testimony for a minute. First major half truth, I went downstairs for a cell phone battery. With a gun in your hand? That's how you go to get your cell phone battery. The truth is I went downstairs. The reason, to confront Wayne Carnegie.
 {¶ 38} Another half truth, I didn't look when I unlocked the door. You are so afraid that you are carrying a gun around you know that Wayne Carnegie was just in front of the house blowing his horn, knocking on the door and you don't even look when you unlock the door.
 {¶ 39} And by the way, think about how you would do that. It's an unfamiliar house and that's a complicated latch. Gun in one hand and you are fiddling with the knob and you are not even looking outside. Um-hum.
 {¶ 40} The truth is he went down, confronted Wayne Carnegie. He unlocked the door and let him in and got into an argument with him and shot him.
 {¶ 41} The ultimate half truth, I shot Wayne Carnegie because I thought he was reaching for something. Shot Wayne Carnegie.
{¶ 42} (Tr. 832-834).
{¶ 43} We find no plain error in the prosecutor's closing statements individually or taken as a whole. His references to half truths were made to focus the juries' attention on the inconsistencies between defendant's pretrial statements and his testimony at trial. The State is permitted to comment on the testimony of a defendant, and may suggest a logical conclusion that is to be drawn therefrom. State v. Thompson (1993), 87 Ohio App.3d 570, 582. The State is also permitted to state that the evidence supports the conclusion that a defendant is lying, is not telling the truth, is scheming, or has ulterior motives for not telling the truth. State v. Draughn (1992), 76 Ohio App.3d 664, 670.
{¶ 44} Defendant's second assignment of error is overruled.
 III. {¶ 45} THE TRIAL COURT ERRED AND DENIED REGINALD EVANS HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BEFORE A JURY, WHEN IT FAILED TO GIVE AN IMPORTANT INSTRUCTION TO THE JURY.
{¶ 46} In his third assignment of error, defendant argues that the trial court gave an erroneous jury instruction on self-defense. Specifically, defendant claims that the trial court should have instructed the jury that his mistaken belief that the victim was armed did not disqualify him from asserting self-defense as an affirmative defense. Since the defendant did not object to the jury instructions as given, he must demonstrate that plain error occurred. State v. Long (1978),53 Ohio St.2d 91. An erroneous jury instruction does not amount to plain error unless, but for the error, the result of the trial clearly would have been different. Id.
{¶ 47} At trial, defendant claimed that he acted in self-defense in the shooting death of Wayne Carnegie. The elements of self-defense are set forth in State v. Williford (1990), 49 Ohio St.3d 247. Defendant needed to establish the following by a preponderance of the evidence: (1) that he was not at fault in creating the situation giving rise to the affray; (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that he must not have violated any duty to retreat or avoid the danger. The elements of self-defense are cumulative and, if defendant failed to prove any one of the elements by a preponderance of the evidence, he failed to demonstrate that he acted in self-defense. Id.
{¶ 48} Here, at the close of the trial, the trial court instructed the jury in pertinent part, as follows:
 {¶ 49} To establish self-defense, a defendant must prove the following: (A) He was not at fault in creating the situation giving rise to the death of Wayne Carnegie and he had a reasonable ground to believe and an honest belief that he was in imminent danger of death or great bodily harm; (B) and that his only means of retreat or escape from such harm was by the use of deadly force; (C) He had not violated any duty to retreat, escape or withdraw to avoid the danger that was by the use of deadly force.
{¶ 50} * * *
 {¶ 51} In deciding whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, you must put yourself in the position of the defendant with his characteristics and his knowledge or lack of knowledge and under the circumstances and conditions that surrounded him at that time. You must consider the conduct of Wayne Carnegie and decide if his acts or words caused the defendant reasonably and honestly to believe that he was about to be killed or receive great bodily harm.
{¶ 52} (Tr. 864-866).
{¶ 53} We find this instruction sufficient to apprise the jury of the relevant law on self-defense. The jury was instructed to decide whether defendant had an honest belief that he was in imminent harm. An honest belief naturally includes the possibility that the defendant may have been mistaken in his belief.
{¶ 54} Defendant's third assignment of error is overruled.
 IV. {¶ 55} TRIAL COUNSEL'S DEFICIENT REPRESENTATION ON SEVERAL IMPORTANT ISSUES DENIED REGINALD EVANS OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.
{¶ 56} In his fourth assignment of error, defendant claims he was denied the effective assistance of trial counsel because his counsel failed to object to the prosecutor's closing statements and the trial court's jury instruction on self-defense. Defendant also claims that he was denied effective assistance of trial counsel because his counsel did not recall Cheryl Carnegie or Anthony Harper after he finished testifying. We disagree.
{¶ 57} To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Strickland v. Washington (1984),466 U.S. 668.
{¶ 58} With regard to trial counsel's failure to object to the prosecutor's closing statements and the trial court's jury instructions regarding self-defense, we have already held that both the prosecutor's closing argument and the court's jury instructions were proper. Therefore, trial counsel was not ineffective in failing to object. Accordingly, defendant was not denied effective assistance of counsel on these bases.
{¶ 59} With regard to trial counsel's failure to recall Cheryl Carnegie or Anthony Harper following defendant's testimony, we have already held that corroborating evidence concerning specific instances of the victim's violent character should be excluded by a trial court. Therefore, trial counsel was not ineffective in failing to recall these witnesses. Accordingly, defendant was not denied effective assistance of counsel on this basis.
{¶ 60} Defendant's fourth assignment of error is overruled.
 V. {¶ 61} REGINALD EVANS HAS BEEN DEPRIVED OF HIS LIBERTY WITHOUT DUE PROCESS OF LAW BY HIS CONVICTION FOR MURDER AS SAID CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE TO PROVE HIS GUILT BEYOND A REASONABLE DOUBT.
{¶ 62} In his fifth assignment of error, defendant argues that the evidence was insufficient to support his conviction for murder with a firearm because he was acting in self-defense. We disagree.
{¶ 63} When a defendant argues that a murder conviction is not supported by sufficient evidence because he has proved the affirmative defense of self-defense by a preponderance of the evidence, the proper inquiry is whether the verdict is against the manifest weight of the evidence. State v. Thomas (Aug. 25, 1994), Cuyahoga App. No. 65300, unreported; State v. Gardner (Mar. 30, 1989), Cuyahoga App. No. 55171, unreported.
{¶ 64} In determining whether a criminal conviction is against the manifest weight of the evidence, this court must examine the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of the witnesses to determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice. State v. Thompkins (1997),78 Ohio St.3d 380. This court should grant a new trial only in an exceptional case in which the evidence weighs heavily against the conviction. State v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230. If the jury's verdict is supported by sufficient competent and credible evidence going to each essential element of the crime charged, this court may not reverse. Id.
{¶ 65} Here, defendant was convicted of murder. R.C. 2903.02
defines the crime of murder and provides in pertinent part:
 {¶ 66} (A) No person shall purposely cause the death of another.
{¶ 67} Defendant's argument with respect to this assignment of error is that the weight and sufficiency of the evidence required the jury to return a not guilty verdict based on the affirmative defense of self-defense.
{¶ 68} To establish self-defense, defendant must show: (1) that he was not at fault in creating the situation giving rise to the affray; (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that he must not have violated any duty to retreat or avoid the danger. State v. Williford, supra at 247.
{¶ 69} At trial, the jury heard Dr. Frank Miller, a forensic pathologist in the Cuyahoga County Coroner's Office, testify that Wayne died of three gunshot wounds to the left upper back, left side of chest and middle of back. Curtis Jones, a forensic scientist with the Cuyahoga County Coroner's Office Trace Evidence Department, testified that Wayne's hands did not reveal the presence of gunshot residue, which indicated that the victim did not hold a firearm at the time of his death.
{¶ 70} Cheryl Carnegie testified that Wayne and defendant had a stormy relationship and that Wayne had threatened defendant in the past. She testified that defendant had a gun with him on the evening of the shooting. She testified that defendant said You know, I'm getting tired of this prior to going downstairs and shooting Wayne. She testified that defendant left town after the shooting.
{¶ 71} Ricky Elmore, the ten-year-old neighbor, testified that he heard Wayne knocking on the door. He testified that he heard defendant come down the steps, open the door, and start arguing with Wayne. He then heard three or four shots. Anthony Harper testified that defendant telephoned him after the shooting and told him that he had gone downstairs after hearing banging on the door, got into a verbal altercation with Wayne, and shot him. Defendant also told Anthony that he was not sure if Wayne had a weapon on him. Antwan Blackshear testified that he spoke with the defendant a week after the shooting. He testified that defendant told him he went downstairs to tell Wayne to leave, that they got into an argument, and that defendant shot Wayne.
{¶ 72} Defendant testified on his own behalf. He testified extensively about prior confrontations between him and the victim and his fear of Wayne. He testified that on the morning of the shooting, he did not go downstairs to confront Wayne, but only to get his cell phone battery out of the car. He testified that he was surprised to see Wayne outside the back door when he opened it. He testified that he believed Wayne was reaching for a gun, so he fired his gun. He explained that he only meant to pull the trigger once, but the gun kept on firing. Defendant took off after he saw Wayne fall. He testified that after the shooting he went to Michigan and disposed of the gun.
{¶ 73} After reviewing the record, weighing the evidence and considering the credibility of the witnesses, we find that the jury did not clearly lose its way pursuant to Thompkins, supra. We find there to be substantial, competent, credible evidence upon which the jury could base its decision that defendant was not acting in self-defense at the time of the shooting and was guilty of murder beyond a reasonable doubt. From the evidence adduced at trial, the jury could have easily concluded that defendant was at fault in creating the situation giving rise to the affray or that he did not adequately withdraw from the affray. Defendant's testimony regarding the events leading up to the shooting were inconsistent with the explanations he had given to Anthony Harper and Antwan Blackshear. The jury was free to believe the State's witnesses over defendant's own testimony. See State v. Thomas (Aug. 25, 1994), Cuyahoga App. No. 65300, unreported. Accordingly, we conclude defendant's conviction for murder was not against the manifest weight of the evidence.
{¶ 74} Defendant's fifth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES D. SWEENEY, P.J., and ANN DYKE, J., CONCUR.
[1] At trial, Cheryl testified that her first service revolver had been stolen sometime in 2000. After the trial court sustained a State's objection, Cheryl could not testify about the incident anymore. The defense proffered that Cheryl would have testified that she believed Wayne had stolen her gun because he was the only other person who knew where she kept it. She would have testified that she told defendant that she believed Wayne had stolen her gun and had it in his possession. The trial court ruled that there had been no foundation about the defendant's state of mind and defense counsel could recall Cheryl to testify after the defendant testified about his state of mind.